ADAMSON & MAIL v. 4,300 TONS PYRITES ORE.

(District Court, E. D. South Carolina. May 23, 1905.)

CHARTER PARTY—CONSTRUCTION—DEMURRAGE.

Where a vessel was chartered to load at a pier belonging to a town in a foreign port, in charge of the captain of the port, whose duty it was to assign vessels to berths at the pier, and he refused to permit the vessel to berth in her turn at the pier in a berth where she would project beyond the pier, resulting in a delay, such delay was caused by the "intervention of constituted authorities," within an exception in the charter party relieving the charterers from liability for demurrage.

[Ed. Note.—Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Libel for demurrage.

Bryan & Bryan, for libelant.

Nathans & Sinkler, for respondents.

BRAWLEY, District Judge. The steamship Robert Adamson was let to freight to the Davis Sulphur Ore Company June 11, 1901, for a voyage from Huelva, Spain, to Charleston. The charter party executed on that day was on the printed form of the Davis Sulphur Ore Company, which provided that the steamship should proceed to the port of Huelva, and "there load where and as ordered in the regular turn for steamships." The shipowner, not being willing to charter his ship on those terms, had required an amendment; and, as executed, the charter party provided that the steamship should proceed to the port of Huelva, Spain, and "there load where and as ordered in the regular turn for steamships if at Rio Tinto Pier, or three working days loading either at the Town Pier of the port or at any other loading places named by charterers or their Agents on arrival." The charter party further provided that, "being so loaded, steamship should proceed to such points in the United States at Charterers' option [Charleston being included], and there discharge according to the custom of the port. Any days or parts of days not consumed in loading shall be added to the time for discharging, and any extra time consumed in loading shall be deducted from the time for discharging"; there being a further provision for "ten days on demurrage at port of loading or discharge if required, at the rate of 20 shillings per hour, payable at port of discharge; all disputes to be settled at port of discharge either in the law Courts or by arbitration there." The steamship arrived at Huelva July 17th, and gave due notice of readiness to load under such charter, and the agent of charterers notified the master that such steamship would load at the Town

.Pier. It is not disputed that the first lay day commenced at noon, July 22d. The master's testimony is that:

"Mr. Poole [who was the charterers' agent] told me verbally that the first turn day would commence the next day, the 18th, at noon, and the last would finish at noon on the 22d. Mr. Poole also intimated that he hoped that there would be a clear berth ready for me on the 30th of July, at midnight, and that he would send the pilot over when berth was ready."

It appears from the testimony that the turn of the steamship at the Town Pier came on the night of the 30th of July, and that the pier master so informed the charterers, but, for reasons to be stated, the pilot was not sent to the ship on that night, and she was not actually brought to the pier until August 6th; and the contention in this case is whether the delay which supervened between July 30th and August 6th shall be deducted from the lay days. In behalf of the respondents it is claimed that this delay or hindrance was caused by the "intervention of the constituted authorities," and is within the exception of the charter party. The provision of the charter party on this subject is as follows:

"Charterers to have the liberty to load and discharge on Sundays and holidays without time counting, and no time shall count as lay days during which any delay or hindrance may occur in procuring, carrying, shipping, exporting, or discharging cargo, by reason of frosts, floods, bad weather, disturbed condition of sea, holidays, political disturbances, quarantine, strikes, intervention of constituted authorities, accidents, stoppage of mines supplying cargo, stoppage of Consignees' works, stoppage of trains, or any other causes whatsoever beyond the control of the shippers or the Charterers."

It is this contract that the court is now called upon to construe and execute.

It appears from the testimony that the berth No. 3 at the Town Pier was one where the steamship, owing to her length, would have projected between 80 and 90 feet beyond the end of the pier, there being another vessel lying on the inside at that time in berth No. 1; and it further appears that it was not unusual for vessels lying at that pier to project beyond the end of it; and the contention of the libelant is that, in those circumstances, it was not a safe berth, in fact, and a good deal of testimony has been offered to support that contention. If the master of the steamship had refused to take the berth because it was unsafe, it seems to me that there is sufficient testimony in the case to support his refusal, and the decree should be for the libelant, for I think it cannot be disputed that it is the duty of the charterer, under the general maritime law, to provide a safe berth. There is considerable conflict in the testimony on this point, the libelant having offered proof that it was not safe, and the respondents having offered proof that it was safe, and that other vessels, projecting beyond the pier head to a considerably greater length than the Adamson would have done, had loaded at the pier without injury. But the testimony of the chief pilot of the port of Huelva, acting under the orders of the captain of the port, or, rather, of his second in command—the chief officer being absent—is that he was forbidden to take the Adamson to that berth, on the ground that it would cause damage to

the ship or the pier, and would have been an obstruction to navigation in the river. It appears from the testimony that the Town Pier belonged to the town, and that it was the duty of the captain of the port to determine questions of this nature. In an ordinary case the determination of a question of fact by an official whose duty it was to determine it would be so far controlling that it would be our duty to accept it, unless it was clearly against the weight of testimony; and, if the master of the steamship had refused to go to the berth because the authorities had decided that it was not a safe berth, it would require a great deal more testimony than has been produced here to hold the ship responsible for any loss incurred by such refusal. But that is not the case. The letter of the master to Poole, the agent of the charterers, of date August 2d, shows that he did not refuse to go to the berth for the reason that it was not safe. On the contrary, it is to be fairly inferred that he considered the berth safe, and was willing to go there if he had been permitted. The letter is as follows:

"Confirming my conversation with your brother this morning, I beg to inform you that I have protested before his Britannic Majesty's Consul against the Town Pier officially, and all concerned in preventing my steamer from getting a berth in such pier as ordered by you."

The conversation referred to has been testified to by Poole's brother, and it appears from that testimony that the master desired to take the berth, and consulted him as to the possibility of success in undertaking some legal proceedings to compel the authorities to allow him to take his regular turn; and it further appears that, if he had berthed his ship at No. 3 berth on the night in question, he could on the next day have been transferred across the dock to the No. 4 berth, where the loading could have proceeded without any difficulty arising from the projection of his ship beyond the end of the pier, and that in point of fact his ship was moved from No. 3 berth when his next turn came, to No. 4 berth. By reason of the refusal of the "constituted authorities" to allow him to take the No. 3 berth when his turn came, he was put behind all the other vessels which at that time were ahead of him, and did not get to the pier until August 6th. I feel bound to conclude, therefore, that the delay and hindrance was due to the "intervention of the constituted authorities," and to a cause "beyond the control of the shippers or the charterers," and that under the exceptions in the bill of lading the charterers are not responsible for the delay. Many of the cases cited by the learned counsel for the libelant in opposition to this view have arisen upon bills of lading where the liability of common carriers is fixed by the common law. These doctrines have no application in the construction of a charter party, where the rights and obligations of the parties depend upon the stipulations of the contract. It would be difficult to draw a contract where the ordinary vicissitudes which might be likely to interfere with the charterers' performance of their obligations are more carefully provided against. As the charter party was prepared by the charterers, any doubts as to its con-

struction ought to be solved against them; but if it is clearly provided that no time shall count as lay days, during which delays or hindrances were due to "any causes whatsoever beyond the control of the shippers or the charterers," it seems to be the duty of the court to enforce it, and that the delay in berthing the ship in her regular turn was due to the "intervention of constituted authorities" is clearly proved.

My first impression was that the charterers were liable for the demurrage; that, inasmuch as it was their duty to provide a safe berth for the ship, the determination by the captain of the port and the chief pilot that berth No. 3 was an unsafe berth was conclusive, and fixed the liability of the charterers. But upon reconsideration, and reviewing all the testimony, I am led to the conclusion that the causa proxima of the loss was not any supposed danger in the berth, for the master of the ship accepted it as safe, but the intervention of the port authorities, without which the delay and loss would not have occurred. The charter party protects the charterers against delays or hindrances arising from that cause, or from "any causes whatsoever" beyond their control.

The libel must therefore be dismissed.